646 So.2d 496 (1994)
Fred PENTON
v.
SIEMENS ENERGY AND AUTOMATION INC. and Zurich American Insurance Company.
No. 94-CA-0286.
Court of Appeal of Louisiana, Fourth Circuit.
November 30, 1994.
*498 Lloyd N. Frischhertz, Seelig, Cossé, Frischhertz & Poulliard, New Orleans, for plaintiff.
Delbert G. Talley, Covington, for defendant.
Before KLEES, CIACCIO and ARMSTRONG, JJ.
ARMSTRONG, Judge.
This is a worker's compensation case. The trial court awarded the plaintiff, Fred Penton, Supplemental Earnings Benefits for one of the two periods claimed by Mr. Penton and also awarded him part of the medical expenses and medical deposition costs claimed by him. The trial court denied any award of sanctions or attorney's fees against Mr. Penton's employer, Siemens' Energy and Automation, Inc., or Siemens' insurer, Zurich American Insurance Company. Siemens and Zurich appealed as to the award of any SEB or medical expenses. Mr. Penton cross-appealed as to the denial of SEB for the second period claimed by him, the denial of some of the medical expenses and medical deposition costs claimed by him, and the denial of penalties and attorney's fees. As to Siemens' and Zurich's appeal, we affirm. As to Mr. Penton's cross-appeal, we reverse in part (as to the denied medical expenses and medical deposition costs) and otherwise affirm.
Mr. Penton was employed by Siemens when he suffered an on the job accident. Specifically, he slipped and fell on a bolt on the floor of a Siemens' plant on December 28, 1988.
Mr. Penton suffered a back injury as a result of the fall. Pursuant to physician's instructions, he did not go back to work immediately after his fall. He had not yet returned to work when, about one week later, on January 3, 1989, Siemens shut down the plant (apparently permanently) and discharged all of the plant employees including Mr. Penton. Siemens and Zurich paid Mr. Penton one week of compensation benefits and then terminated the benefits.
Mr. Penton saw Siemens' industrial medicine physicians, Drs. Brian Naccari, Robert Segura and Terry Segura, immediately after the December 27, 1988 accident and for about a week and a half thereafter. Specifically, Mr. Penton saw those doctors on December 27, 1988, December 28, 1988, January 3, 1989. They diagnosed Mr. Penton as suffering from "lumbrosacral and mid to upper thoracic spine strains." Mr. Penton did not see a doctor again until he saw Dr. Terry Segura on October 3, 1989 at which visit he had the same symptoms as at the earlier visits. Mr. Penton explains the lack of doctor visits for over eight months as based on his difficulty in paying as he had been laid-off, had income only from odd jobs and was receiving no compensation benefits. Mr. Penton also explains that he had to travel 140 miles round trip to see Drs. Naccari, Segura and Segura.
About ten days after his October 3, 1989 visit to Dr. Terry Segura, Mr. Penton saw Dr. Hoerner, who ordered an EMG and nerve conduction studies. Those tests were performed by Dr. Burns on October 19, 1989, but were not very helpful in further diagnosing Mr. Penton's condition. In any event, Dr. Hoerner, like the earlier doctors, diagnosed Mr. Penton as suffering from lumbrosacral and thoracic sprains.
Up to this point, that is, from the December 27, 1988 accident and the January 3, 1989 discharge until late October, 1989, Mr. Penton's only employment consisted of odd jobs with his brother's company, a lawn mowing business and some work as a barber. Mr. Penton was unable to accept a number of possible full-time jobs because they were too physically demanding in light of the condition of his back.
Late in October 1989, Mr. Penton moved to South Carolina to accept employment with Metal Leve, Inc. This job paid more than his previous job with Siemens. In South Carolina, Mr. Penton saw Dr. Margalit on *499 October 30, 1990; November 30, 1990; and January 8, 1991. Dr. Margalit ordered an MRI for Mr. Penton, but it showed no significant abnormalities. Dr. Margolit also performed a thermogram on Mr. Penton, and the results were positive, but the trial court found this type of test to be "controversial." Dr. Margalit concluded that Mr. Penton suffered from "a nerve irritation [that was] causing his pain in his back" and ordered physical therapy for Mr. Penton. Upon discharging Mr. Penton on January 8, 1991, Dr. Margalit reported a finding of a 10%-15% partial impairment to his back.
Over a year later, Mr. Penton consulted an arthritis specialist, Dr. Boyd. Mr. Penton saw Dr. Boyd on February 26, 1992; August 26, 1992; September 8, 1992; and October 6, 1992. Mr. Penton sought his consultation because his family had a history of arthritis and, thus, he wondered whether his back pain might be arthritis. Dr. Boyd performed tests and ruled out arthritis. Dr. Boyd referred Mr. Penton to Dr. Parrot who, on October 6, 1992, found him to be neurologically normal but suffering from chronic low back pain secondary to work-related trauma. Dr. Parrot ordered exercise and physical therapy.
Mr. Penton was laid-off in South Carolina by Metal Leve on February 1, 1993 and remained unemployed until he began his employment with Calhoun Gin Company as an assistant manager on June 1, 1993. This job paid more than had his earlier job with Siemens.
Mr. Penton claims that he is entitled to SEB for two periods. First, he claims that he is entitled to SEB for a period of 40 weeks from December 27, 1988, the date of his accident, until October 21, 1989, when he obtained a job with Metal Leve, Inc. in South Carolina. Second, Mr. Penton claims that he is entitled to SEB for the 18 week period from his February 1, 1993 layoff by Metal Leve, Inc. until his June 1, 1993 employment by Calhoun Gin Company. The trial court awarded SEB to Mr. Penton as to the earlier period, but denied him SEB as to the later period. Siemens and Zurich argue that SEB should not have been awarded for the first period. Mr. Penton argues that SEB should have been awarded for the second period as well.
A claimant is entitled to SEB if, as a result of a work-related disability, the claimant is not able to earn at least 90% of his pre-injury wages. Allen v. City of Shreveport, 618 So.2d 386 (La.1993). This means that the claimant is entitled to SEB if, as a result of a work-related injury, the claimant is unable to perform any available job that will pay 90% of the claimant's pre-injury wages. Id. If the employee's former job no longer exists, such as Mr. Penton's former job at Siemens, it is irrelevant that the claimant is not disabled from performing his or her former job. Id.
The initial burden of proof, that the claimant cannot earn at least 90% of his or her pre-injury wages, is upon the claimant. Daigle v. Sherwin-Williams Co., 545 So.2d 1005, 1008-1009 (La.1989). If the claimant meets that burden, then the burden of proof shifts to the defendant to show how much the claimant could earn despite the disabling work-related injury. Id. The more the claimant could have earned, the less SEB is due. Id. These determinations by the trial court as to SEB are factual and, in worker's compensation cases, the trial court's findings of fact are subject to the "clearly wrong" or "manifest error" standard of appellate review. Bruno v. Harbert International, Inc., 593 So.2d 357, 361 (La.1992). See also Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 882-83 (La.1993) (discussing clearly wrong/manifest error standard); Rosell v. ESCO, 549 So.2d 840 (La.1989) (same).
As to the first time period in question, December 27, 1988 to October 21, 1989, the trial court found that:
[T]he medical testimony [as to the period] between the date of the accident and October, 1989 all convincingly shows that Mr. Penton continued to suffer physical limitations that relegated him to light duty activities which precluded lifting or bending or stooping. Coupled with the fact that his medical restriction prevented him from working at available jobs that called for manual labor or heavy lifting, Mr. Penton's *500 evidence sufficiently established a prima facie case of entitlement to SEB.
The trial court also noted that Mr. Penton applied for more than 40 jobs during this time period.
The trial court had the medical records of Drs. Naccari, Segura and Segura, the deposition testimony of Dr. Terry Segura, and the medical records and deposition testimony of Dr. Hoerner as well as the testimony of Mr. Penton upon which to base its factual findings. Drs. Naccari, Segura and Segura first placed Mr. Penton on light duty, then told him not to return to work and eventually released him for work. Both Drs. Naccari, Segura and Segura and Dr. Hoerner concluded that Mr. Penton had suffered back strains. Mr. Penton testified as to his extensive job search and the fact that the condition of his back prevented him from obtaining a number of jobs that involved heavy labor. We cannot say that the trial court was manifestly erroneous or clearly wrong in finding that Mr. Penton was, as a result of his work related injury, unable to earn at least 90% of his pre-injury wages during the December 27, 1988 to October 21, 1989 time period. Thus, Mr. Penton made a prima facie case for SEB.
With Mr. Penton having so made the prima facie case for SEB, the burden shifted to Siemens and Zurich to show what amount, if any, Mr. Penton could have earned during the December 27, 1988 to October 21, 1989 time period. The more that Mr. Penton could have made, the lower the amount of SEB. However, Siemens and Zurich offered no evidence, either by a vocational expert or lay testimony, as to this issue. As the trial court noted: "To be sure, Siemens and Zurich failed to carry their burden of proving that Mr. Penton was actually earning less than he was able to earn by affirmatively showing evidence as to the amount of wages he was, indeed, able to earn." However, based on Mr. Penton's testimony as to what work he did do during the December 27, 1988 to October 21, 1989 time period (odd jobs for his brother's business, mowing grass and barbering), the trial court concluded that Mr. Penton was able to earn minimum wage during that period and calculated the amount of SEB on that basis. As neither party has raised any issue as to the amount of SEB, we express no opinion as to the trial court's determination that Mr. Penton could have earned the minimum wage or as to the trial court's use of the minimum wage in calculating the amount of SEB.
As to the second period in question, February 1, 1993 to June 1, 1993, the trial court rejected Mr. Penton's claim for SEB. Mr. Penton argues that the situation during this second period in question was the same as during the first period in questionif he had been able to do heavy work instead of being limited to lighter work, he immediately would have been re-employed after his February 1, 1993 layoff by Metal Leve, Inc. in South Carolina.
The trial court gave two reasons for denying Mr. Penton SEB for this second period in question. First, the trial court held that there was no "medical corroboration" of Mr. Penton's disability during this second period in question (that is, there were no doctor visits and so no medical testimony as to the second period in question). Mr. Penton argues that the trial court committed reversible error by imposing such a "medical corroboration" requirement. Mr. Penton may be correct that there is no such "medical corroboration" requirement, See Adams v. NOLA Fleet Shipyard, 617 So.2d 88, 90 (La. App. 4th Cir.1993), but if there was an error in that regard, it is of no importance to the present case because the trial court had a second reason for denying SEB to Mr. Penton for the second time period in question.
The trial court's second reason for denying SEB for the second time period in question is:
Of equal importance, the court found Mr. Penton disingenuous in his testimony about being disabled during this period. One need focus only upon the fact that Mr. Penton was gainfully employed from October 1989 to February 1993, to conclude that when he was not working for 16 to 18 weeks, it was because of a lay-off and not due to any impairment.
In short, the trial court did not believe that disability prevented Mr. Penton from immediate *501 re-employment after the February 1, 1993 Metal Leve, Inc. lay-off. In particular, the trial court, which heard Mr. Penton live, did not find him credible on this point. Moreover, the two jobs Mr. Penton had immediately before and after the second time period in question, with Metal Leve, Inc. and Calhoun Gin Company, each paid more than did his job at Siemens. This certainly lends support to the notion that Mr. Penton was physically capable, during the second period in question, of earning at least 90% of the wage he was earning at Siemens at the time of his accident. We cannot conclude that the trial court committed manifest error or was clearly erroneous in denying SEB for the February 1, 1993 to June 1, 1993 time period.
The trial court held Siemens and Zurich liable for the medical bills for doctor visits made during the time period for which Mr. Penton was awarded SEB, that is, from December 27, 1988 to October 21, 1989, but held Siemens and Zurich not liable for medical bills for later doctor visits. Specifically, the trial court excluded the bills and also the medical deposition costs, of Dr. Margalit, Dr. Boyd and Dr. Parrot because Mr. Penton saw those doctors after his October 21, 1989 employment with Metal Leve, Inc. in South Carolina. In other words, the trial court included medical bills incurred during the time Mr. Penton was eligible for SEB but excluded medical bills incurred during the time Mr. Penton was employed at Metal Leve, Inc. and was not eligible for SEB. This was an error of law. The award of medical expenses is not dependent upon the award of, or eligibility for, SEB. Regardless of SEB, the employer is responsible for medical expenses arising from the work-related injury. La.R.S. 23:1203; See Lubom v. L.J. Earnest, Inc., 579 So.2d 1174, 1181 (La. App.2d Cir.1991). See also Ben v. Alberto Culver/Sally Beauty Co., 544 So.2d 1291 (La. App. 4th Cir.1989) (award of medical expenses affirmed although SEB denied).
It is apparent that the visits to Dr. Margalit and Dr. Parrot were related to Mr. Penton's on-the-job back injury. Mr. Penton saw Dr. Margalit and Dr. Parrot due to back pain and there is no indication that the back pain had any origin other than Mr. Penton's on-the-job back injury. In fact, Dr. Parrot specially found the back pain to be the result of work-related trauma. Also, because the visits to Dr. Margolit and Dr. Parrot were due to the work-related injury, the depositions of Dr. Margolit and Dr. Parrot were so relevant and necessary as the depositions of the doctors who saw Mr. Penton earlier. The bills for the visits to Dr. Margolit and Dr. Parrot, and the costs of their depositions, should have been included in the judgment against Siemens and Zurich.
As to Mr. Penton's visit to Dr. Boyd, the arthritis specialist, the issue is somewhat closer. Mr. Penton went to see Dr. Boyd because of a family history of arthritis. Obviously, Mr. Penton wanted to see if his back pain was due to arthritis rather than his December 27, 1988 fall. Ultimately, Dr. Boyd ruled out arthritis. Because Mr. Penton reasonably went to see Dr. Boyd due to his back pain, and the back pain was determined to be a result of the on-the-job injury, we believe that the expense of the visit to Dr. Boyd is sufficiently related to the on-the-job injury so as to be covered by La.R.S. 23:1203 so that Siemens and Zurich are responsible for that expense. For the same reason, Dr. Boyd's deposition was relevant and necessary along with those of the doctors who saw Mr. Penton earlier. Thus, Dr. Boyd's bill, as well as the cost of Dr. Boyd's deposition, should have been included in the judgment against Siemens and Zurich.
Mr. Penton also argues that the trial court erred by refusing to award him attorney's fees and penalties against Siemens and Zurich because of their denial of compensation benefits and medical expenses, pursuant to La.R.S. 23:1201 and 1201.2. The trial court denied penalties and attorney's fees because it found that Siemens and Zurich reasonably had controverted Mr. Penton's claims, that Siemens and Zurich had not acted arbitrarily or capriciously or without reasonable foundation for their actions, and because Mr. Penton prevailed only in part. A trial court's determination of whether or not to award attorney's fees should not be disturbed upon appellate review unless that determination is clearly wrong or manifestly erroneous. Lemoine v. Schwegmann *502 Giant Supermarkets, Inc., 607 So.2d 708, 713 (La.App. 4th Cir.), writ denied, 609 So.2d 258 (La.1992). Under the facts of this case, which are described above, we cannot say that the trial court was clearly wrong or manifestly erroneous in denying penalties and attorney's fees. The trial court could reasonably conclude that Siemens and Zurich's conduct did not meet the standards for imposition of penalties and attorney's fees under R.S. 23:1201 and 23:1201.2. (The trial court had another reason, based upon statutory interpretation, for denying penalties and attorney's fees, which Mr. Penton attacks as erroneous, but we need not consider that issue because we have affirmed the trial court's denial based on the just-described grounds).
For the foregoing reasons the judgment of the trial court is amended to award plaintiff the amounts of the bills for office visits to Dr. Margalit, $1,542.00, Dr. Boyd, $630.00, and the cost of the depositions of Dr. Margalit, Dr. Boyd, and Dr. Parrot, $340.50.[1] We affirm the judgment of the trial court as amended and in all other respects.
AMENDED; AFFIRMED AS AMENDED.
NOTES
[1] Plaintiff failed to present evidence of the cost of the office visits to Dr. Parrot.